# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MARK A. PETERSON,**

    **Plaintiff,**

    **v.**                               **Case No. 14-CV-1072**

**CITY OF MILWAUKEE,**

    **Defendant.**

---

## DECISION AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

Mark A. Peterson brings this lawsuit against his employer, the City of Milwaukee, alleging that he was discriminated against on the basis of his race and retaliated against for filing an employment discrimination complaint. The City has moved for summary judgment on Peterson's claims. For the reasons I will explain here, the City's motion is granted and the case is dismissed.

### SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary

judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc.,Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## FACTS[1]

Plaintiff Mark A. Peterson worked for the Milwaukee Police Department as a detective at all times relevant to this case. (Def.'s Reply to Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 1.) Peterson has been assigned to the Homicide Investigations Unit since the late 1990s. (PPFOF ¶ 2.)

---

[1] The plaintiff did not respond to the defendant's proposed findings of fact. Therefore, the facts are undisputed and taken as true, to the extent they are not controverted by Peterson's proposed findings of fact. Civil L.R. 56(b)(4) (E.D. Wis.) ("The Court will deem uncontroverted statements of material fact admitted solely for the purpose of deciding summary judgment.").

*Administrative Duties*

On January 31, 2009, Peterson's son, Michael Peterson, committed an armed robbery. (PPFOF ¶ 3; Defendant's Proposed Findings of Fact ("DPFOF") ¶ 3.) Michael was ultimately convicted. (DPFOF ¶ 3.) Michael was arrested shortly after the crime was committed; soon thereafter, the victim reported receiving phone calls from an unknown person attempting to offer him money or otherwise intimidate him in order to get him to drop the charges and not cooperate in the prosecution against Michael. (DPFOF ¶ 4; PFOF ¶ 4.) The victim made a digital recording of one of the phone calls and provided it to the Milwaukee Police Department ("MPD"). (DPFOF ¶ 5; PPFOF ¶ 5.) The victim then discovered that Michael's father was a member of the MPD and filed a complaint against Peterson alleging that the detective had placed the intimidating phone calls. (DPFOF ¶ 6.) Parallel investigations were conducted by both the MPD and the Milwaukee District Attorney's Office. (DPFOF ¶ 7.) The DA's Office opened a John Doe investigation under Wis. Stat. § 968.26 (DPFOF ¶ 8) on March 30, 2009 (PPFOF ¶ 18). By law, the John Doe investigation was completely separate from the MPD's investigation; evidence was sealed and MPD had no access to the information or evidence obtained in the course of the John Doe investigation. (*Id.*) Though the MPD and DA's Office can share information when their investigations occur simultaneously, the DA's Office uses its own investigators. (DPFOF ¶ 9.) The MPD has no supervision, nor does it have any influence or input into the John Doe investigation or control its timing or length. (*Id.*) When, how, and if a John Doe investigation occurs is entirely up to the DA's Office. (DPFOF ¶ 10.)

During the course of the MPD investigation, management listened to the recording and obtained the opinions of department members who had worked with Peterson and

knew his voice and speech mannerisms. (DPFOF ¶ 22.) They stated that they could not rule out that the voice belonged to Peterson. (*Id.*) One detective listened to the recording and compared it with another recording (a conversation between Peterson and his son) and said that the voices were similar. (PPFOF ¶ 7.) The MPD also sent the recording of the call to the victim and a recording of Peterson's voice to the FBI for voice comparison. (PPFOF ¶¶ 8, 10; *see also* PPFOF ¶ 11.) The FBI reported back that the recordings were insufficient in recording and/or voice quality, which prevented meaningful comparison with each other or any other voice sample. (PPFOF ¶ 16A.)[2] In October of 2009, during the pendency of the John Doe investigation, Assistant Chief James Harpole sent an email to Deputy District Attorney Kent Lovern asking about Peterson's status. He noted that the department's current vacancy rate, coupled with long term leaves of absence, left him trying to maximize the available detectives to cover the department's work load. (PPFOF ¶ 25.) Harpole indicated that he understood if additional time was necessary and did not intend to put pressure on the DA's Office to make a decision prematurely. (PPFOF ¶ 26.) In January 2010, Peterson requested a meeting with Chief Flynn; his request was denied due to the pending investigation. (PPFOF ¶ 27.)

Shortly after the citizen complaint was filed in early February 2009 against Peterson, management reviewed the evidence (consisting primarily of the digital recording) and concluded that Peterson should be placed on administrative duty while the MPD investigations were pending. (DPFOF ¶ 11.) Peterson maintained the rank of detective. (*Id.*) This is in accord with department policy, governed by MPD Standard Operating Procedure ("SOP") 450 – Personnel Investigations. (DPFOF ¶ 12.) When a complaint is made, the

---

[2] After proposed finding of fact 18, the plaintiff started again at 14. Therefore, the repeated numbered paragraphs 14, 15, 16, 17, and 18 will be referred to as 14A, 15A, 16A, 17A, and 18A.

case is independently reviewed to determine the nature of the case and the quality of the evidence in order to determine if placing the department member on administrative duty is appropriate. (*Id.*) Other members of the department have been placed on administrative duty. (*Id.*) There are a number of reasons to put a department member on administrative duty, including addressing the concern that a member who is under investigation may face criminal charges or termination, which would in turn present problems with credibility as well as the public trust in general. (DPFOF ¶ 14.) MPD management had several options regarding what to do with Peterson while the investigation was pending: it could have continued to have him work his regularly-assigned duties; placed him on administrative duties with police powers (which is what MPD did); placed him on administrative duty without police powers; or fully suspended him. (DPFOF ¶ 15.)

The disposition the department gives to any member is independently determined given the member's assignment, the nature of the complaint, and the quality of the evidence (as it is known at the time the decision is made). (DPFOF ¶ 16.) The disposition can change as more information is obtained. (DPFOF ¶ 17.) Regardless of assignment, the more serious the case and the stronger the evidence, the more likely that the department member will be moved towards the most severe option—suspension. (*Id.*) At the time management decided what disposition was suitable for Peterson, management was aware that if true, the citizen complaint would constitute a criminal act as well as a violation of the Code of Conduct and SOPs. (DPFOF ¶ 18.) Management also knew that as a homicide detective, Peterson worked on some of the most important cases in the department and occupied a position of significant responsibility and public trust. (DPFOF ¶ 19.) These factors weighed in favor of placing Peterson on administrative duty so as to contain the threat of his loss of credibility

5

before courts and juries and so that he did not continue to work on homicide investigations to which he was assigned in the event the complaint was substantiated or he was charged or convicted of committing a crime. (DPFOF ¶ 20.) The decision to place Peterson on administrative duty was buttressed by the fact that there was a digital voice recording of one of the alleged calls of the suspect making the intimidating statements. (DPFOF ¶ 21.) Additionally, as noted earlier, department members who worked with Peterson listened to the recording and were not able to rule him out as the person on the recording. (DPFOF ¶ 22.)

Peterson was placed on administrative duty in February 2009. (DPFOF ¶ 24.) He maintained the rank of detective throughout the time he was on administrative duty and was paid for all the time he worked accordingly. (DPFOF ¶ 25.) The level of responsibility in the duties Peterson was required to perform was reduced significantly compared to those duties he had as a homicide detective. (DPFOF ¶ 26.) That is, in part, the point of administrative duty and is true for every department member placed on administrative duty. (*Id.*)

While Peterson was on administrative duty, he worked in a support role under the command of Captain Kurt Liebold and the immediate supervision of Lieutenant Thomas Stigler. (PPFOF ¶ 45.) On administrative duty, Peterson worked answering phones, assisting the homicide review committee, and dealt with large tasks concerning equipment, desks, cars, etc. (PPFOF ¶¶ 70-71.) Peterson retained a positive attitude and performed his duties with motivation and drive. (PPFOF ¶ 45.) Evaluations dated December 31, 2008; June 30, 2009; December 31, 2009; December 31, 2010; June 30, 2011; December 31, 2011;

6

June 30, 2012; and June 31, 2014 describe Peterson as an asset to the department and do not indicate any area where improvement was needed. (PPFOF ¶ 72.)

The frequency of overtime opportunities was significantly lower for Peterson while on administrative duty compared to the opportunities available when he served as a homicide detective. (DPFOF ¶ 27.) Peterson did work some overtime while on administrative duty and was not denied, blocked, or prevented from working any overtime that was available to him. (*Id.*) Per the Milwaukee Police Labor Agreement, department members do not have a right to overtime. (DPFOF ¶ 28 (citing Milwaukee Police Labor Agreement, Docket # 26-2 at Art. 5 ¶ 2).) The City is under no obligation to continue to provide Peterson with an equivalent amount of overtime while he was assigned to administrative duties as he had as a regular duty detective. (DPFOF ¶ 30.)

As of August 2010, the John Doe investigation was still pending, though MPD management had received multiple assurances from the DA's Office that a charging decision was imminent. (DPFOF ¶ 32.) Management decided not to wait any longer and directed the internal criminal investigation be closed, subject to reopening pending new information. (*Id.*) The internal criminal investigation was "[c]losed pending new information" on August 6, 2010, though the John Doe proceeding remained pending. (DPFOF ¶ 33; *see also* PPFOF ¶ 30.) Peterson signed an acknowledgment on August 10, 2010 that the criminal investigation was closed pending new information. (PPFOF ¶ 31.) Per Harpole, this is not unusual; despite the best efforts of the investigators, at times there is insufficient evidence to prove or disprove the allegation being investigated. (DPFOF ¶ 35.) Harpole also avers that because the John Doe investigation was still pending, Peterson was maintained on administrative duty because placing him back into regular duty could

7

potentially compromise the integrity of then-present and future homicide investigations. (DPFOF ¶ 36; *see also* PPFOF ¶ 46.)

Internal affairs decided to proceed on the personnel investigation and a personnel interview was conducted on August 4, 2010. (DPFOF ¶ 37.) DDA Lovern requested that someone contact him to schedule a final review of the criminal matter with Peterson. (PPFOF ¶ 32.) After being unsuccessful in scheduling something with Peterson's lawyer, Captain Patrick Mitchell and Lieutenant David Salazar issued an order requiring the plaintiff to appear at the DA's Office (PPFOF ¶ 33) in an attempt to ensure Peterson came to the meeting (PPFOF ¶ 34). The detective assigned to deliver the order to Peterson was instructed by Salazar to tell Peterson it was in his best interest to be present at the meeting if he gave her "any bullshit." (PPFOF ¶ 35.)

On September 24, 2010, the DA's Office conducted a charging conference, which was attended by Peterson and his attorney, as well as MPD Detective Sebastian Raclaw, who worked for the Professional Performance Division ("PPD") in the Special Investigations Section ("SIS") and was assigned to Peterson's internal investigation. (DPFOF ¶¶ 38, 95, 97, 98; PPFOF ¶ 37.) DA Chisholm stated that his office was closing the John Doe investigation and that though he believed there was probable cause that Peterson committed the offense, he could not prove it beyond a reasonable doubt so no criminal charges would be issued. (PPFOF ¶ 38; DPFOF ¶¶ 38, 100.) However, Chisholm stated that he believed Peterson was guilty and that he was invoking *Giglio v. United States*, 405 U.S. 150 (1972), against him. (PPFOF ¶¶ 38, 47; DPFOF ¶¶ 38, 100.) Raclaw wrote a memo summarizing the conference, which Harpole reviewed. (DPFOF ¶¶ 38, 99.) Raclaw recommended that Peterson be placed in a position within the MPD that did not require

8

him to testify. (PPFOF ¶ 39.) DA Chisholm also made this suggestion. (DPFOF ¶ 100.) The DA's Office closed its investigation on the day of conference, and the personnel investigation was also closed that day. (DPFOF ¶ 46.)

It was Harpole's understanding of a subsequent conversation with Chisholm that Chisholm believed that there was sufficient information obtained in the John Doe investigation that went against Peterson's credibility and truthfulness to lead him to believe that his office would be compelled to disclose the information gathered in its investigation against Peterson to the defense in any and all future criminal prosecutions in which Peterson would be called to testify. (DPFOF ¶ 39.) It was also Harpole's understanding that the DA's Office might refuse to put Peterson on the stand at all and potentially refuse to prosecute any case in which he was involved. (*Id.*)

According to Harpole, the DA's Office's decision came as a shock to management; even though no criminal charges were to be issued and the MPD investigation was unsubstantiated, Peterson's career as a homicide detective would be effectively over as MPD could not risk pending or future cases by having him work on them (and the DA's Office indicated it may not prosecute any cases with which he was involved). (DPFOF ¶ 40.) This put the department in a bad position, and administrative detective positions do not exist. (PPFOF ¶ 48.) Management was also concerned about the precedential effect of the decision to invoke *Giglio* against department members in any future MPD investigations where the members were not able to be completely cleared and the investigations were similarly closed as unsubstantiated. (DPFOF ¶ 41; PPFOF ¶ 50.) Management disagreed with the DA's Office's decision to invoke *Giglio* against Peterson, and management decided

9

to attempt to convince the DA's Office to reverse that decision.[3] (DPFOF ¶ 42; PPFOF ¶ 49.)

In the interim, however, management determined that Peterson should remain on administrative duty in order to avoid the risks imposed by Peterson being *Giglio*-impaired. (DPFOF ¶ 42.) Harpole communicated personally with DDA Lovern regarding the *Giglio* issue on several occasions—communicating management's concerns and requesting that the DA's Office reconsider its decision. (DPFOF ¶ 43.) Particularly, on January 12, 2011, Harpole sent an email to DDA Lovern regarding the final decision on Peterson, who had not been criminally charged or charged with an administrative rule violation (a preponderance of the evidence standard). (PPFOF ¶ 51.) He expressed concern with the situation it put the department in—where every officer accused and/or investigated would be subject to the same standard of disclosure—and stated that management was of the opinion that it had no choice but to reinstate him like other officers who had been investigated and not charged with a crime or rule violation. (PPFOF ¶¶ 52-53.)

On January 12, 2011, the DA's Office informed Harpole that it was reversing its decision to invoke *Giglio* against Peterson. (DPFOF ¶ 44.) Upon receiving this information, management reinstated Peterson to regular duty, and on January 18, 2011, Peterson returned to the Homicide Investigations Unit at his request. (DPFOF ¶ 45; PPFOF ¶ 54.)

*Internal Discrimination Investigation*

On February 9, 2011, Peterson filed a complaint within the department stating that he was being treated differently based on his race, noting he had been criminally

---

[3] Though Peterson seems to agree that the MPD worked to get the *Giglio* decision reversed, he later asserts that management "[stood] silent allowing [Peterson] to remain in this status for an unprecedented amount of time without any evidence to support their findings." (PPFOF ¶ 92.)

investigated and though cleared of the charges, remained on administrative duty as of December 27, 2010. (PPFOF ¶ 55.) On March 15, 2011, Sergeant Lisa Gagliano sent a memo to Acting Captain Shunta A. Boston-Smith, which stated that Deputy Inspector Denita Ball instructed members of the PPD to initiate an investigation in Peterson's allegations that he was maintained on administrative duty after being cleared in the criminal investigation due to his race. (PPFOF ¶ 56.) The memo noted that if the allegation was sustained, it could constitute a violation of department rules and procedure, the code of conduct, and the SOPs. (PPFOF ¶ 57.)

The PPD conducted an investigation and got information from Harpole who explained the investigations into the witness intimidation allegation, that the DA's Office decided to invoke *Giglio*, and that the DA's Office reversed its decision, at which time Harpole returned Peterson to Homicide. (PPFOF ¶¶ 58-62.) Peterson stated that he felt he had been demoted when he was assigned "to the garage as the first African American detective," stating that the duties were not fitting for a detective. (PPFOF ¶ 63.) He also stated that he felt Caucasian officers had been reinstated at the conclusion of their internal investigation but that he was treated differently because of his race. (*Id.*) Ultimately, the PPD found that Peterson's allegations of race discrimination could not be sustained. (PPFOF ¶¶ 64, 69.)

*ERD and EEOC Complaints*

In July 2011, Peterson filed a complaint with the Department of Workforce Development, Equal Rights Division ("ERD") (Case No. CR201101452). (PPFOF ¶ 73; DPFOF ¶ 84.) The case was also cross-filed with the Equal Employment Opportunities Commission ("EEOC") under the work sharing agreement in case number

11

26G201101289C. (PPFOF ¶ 73; DPFOF ¶ 86.) On March 20, 2012, the ERD determined that there was no probable cause to believe that the City violated the Wisconsin Fair Employment Law as it pertained to retaliation for filing the complaint, but it determined that there was probable cause to believe the City violated Wisconsin Fair Employment Law in terms of his complaint that he was discriminated against because of his race. (PPFOF ¶¶ 74.)[4] On April 9, 2013, the ERD matter was voluntarily dismissed upon Peterson's motion at a Hearing on the Merits. (DPFOF ¶ 87.) Peterson requested that the EEOC conduct an investigation. (*Id.*) On June 6, 2014, the EEOC issued a Notice of Dismissal and a Right to Sue letter without finding there was any reasonable cause to believe that discrimination occurred as Peterson alleged in his complaint. (DPFOF ¶ 89.) Peterson subsequently filed this lawsuit. (DPFOF ¶ 91.)

*Retaliation Claim*

Carrianne Yerkes is an Inspector of Police in the MPD, and she was the Bureau Commander of Specialized Investigations at all times relevant to this case. (DPFOF ¶¶ 51-52.) The Bureau of Specialized Investigation included Metropolitan Investigations, which included the Homicide Investigations Unit. (DPFOF ¶ 53.) When Yerkes was assigned as commander in 2012, Peterson was already assigned to the Homicide Unit. (DPFOF ¶ 54.) On February 26, 2014, Lieutenant Raymond Gibbs, a supervisor under Yerkes' command, drafted a memo concerning a conversation/counselling he had with Peterson. (DPFOF ¶¶ 55, 56; Exh. 1000, Docket # 25-1.) The memo states that Gibbs advised Peterson about two incidents where Peterson had failed to file supplemental reports detailing his investigation in a timely fashion. (Docket # 25-1 at 1.) On both occasions, the lateness of his reports had

---

[4] This proposed finding of fact incorporates paragraph 74, as well as the paragraph below it, which is not numbered. Numbering begins with the next paragraph at 75.

12

adversely affected homicide trials. (*Id.*) Specifically, Peterson failed to file two necessary reports in two separate homicide investigations: *State v. Newman*, Milwaukee County Case No. 12-CF-6028 and *State v. Gill*, Milwaukee County Case No. 2013-CF-617. (DPFOF ¶ 59.) In *Newman*, a mistrial was declared on January 24, 2014 due in part to evidentiary problems with the State's case. (DPFOF ¶ 60.) The *Gill* matter was eventually dismissed on March 13, 2014, also due in part to evidentiary problems with the State's case. (DPFOF ¶ 61.)

In the memo, Gibbs wrote that Peterson had been admonished in court on February 21, 2014 by Milwaukee County Judge Stephanie Rothstein for both the tardiness and the quality of his report. (Docket # 25-1.) Gibbs advised Peterson that this would not be tolerated. (*Id.*) Peterson stated that he agreed that the two incidents were unacceptable, and they discussed ways in which Peterson could ensure that he did not forget to file reports. (*Id.*) Gibbs stated that he believed that counselling Peterson was the proper measure of discipline and that nothing further was needed at that time. (*Id.* at 1-2; *see also* PPFOF ¶ 97.) In discussions with Gibbs, it was decided that the memo and counseling was to be the discipline Peterson would receive for his failure to file the reports. (DPFOF ¶ 62.)

As noted above, Peterson's credibility was called into question by Judge Rothstein on February 24, 2014. (DPFOF ¶ 67.) Judge Rothstein indicated that conflicts in his testimony in the *Gill* case were the basis. (*Id.*) Captain Jeff Point, a supervisor under Yerkes, wrote a memo to Yerkes memorializing the information he gathered about the incident. (DPFOF ¶¶ 63-64; Exh. 1001, Docket # 25-2; PPFOF ¶ 98.) Yerkes received Point's memo on or about March 5, 2014. (DPFOF ¶ 66.) According to Point, subsequent to Peterson's failure in the *Newman* case on or about January 24, 2014, Assistant District Attorney Mark

13

Williams indicated that he did not believe that Peterson's ability to testify effectively in future homicide case was compromised at that time. (DPFOF ¶ 68.) Subsequent to Judge Rothstein's comments in *Gill*, however, ADA Williams indicated that Peterson's credibility had been compromised and that, at a minimum, the DA's Office could not use Peterson in any prosecution before Judge Rothstein and that he believed it would not be long before Peterson's credibility would be compromised throughout the county. (DPFOF ¶ 68.)

Upon learning of this information, Yerkes became concerned about Peterson's ability to effectively be involved in any homicide investigation going forward. (DPFOF ¶ 70.) On March 26, 2014, Yerkes met with Judge Rothstein in a one-on-one meeting. (DPFOF ¶ 71.) Judge Rothstein expressed concerns with the practices of Metropolitan Investigations generally and that she specifically had concerns about Peterson's credibility. (*Id.*) Judge Rothstein did not express similar concern about any other specific member of the MPD. (DPFOF ¶ 72.) Yerkes avers that it is essential that homicide detectives (as well as any other MPD personnel involved in homicide investigations) not have unfavorable credibility determinations; a detective's poor credibility could compromise an entire homicide investigation and prosecution. (DPFOF ¶ 73.) Yerkes determined that due to Peterson's compromised credibility it was in the best interest of the City, the department, and the preservation of the integrity of any future investigations that Peterson no longer participate in homicide investigations and no longer be assigned to the Homicide Investigation Unit. (DPFOF ¶ 74.) She decided to transfer Peterson to the Investigative Management Division where he could act as a liaison to the DA's Office. (DPFOF ¶¶ 75-76; *see also* PPFOF ¶¶ 93, 95.) He was transferred on April 8, 2014. (PPFOF ¶¶ 76-77.)

14

This type of transfer is not unprecedented in the MPD, and department members have been transferred from one position to another for similar reasons. (DPFOF ¶ 77.) Yerkes selected the particular position of liaison to the DA's Office because Peterson's credibility would not pose any significant problem in the performance of his duties as a liaison. (DPFOF ¶ 78.) Peterson was not demoted as a result of this transfer; he maintained his rank of detective, and he continues to hold that job assignment and rank. (DPFOF ¶ 79.) Yerkes avers that she did not transfer Peterson due to his race or in retaliation against him for any reason. (DPFOF ¶ 80.) Yerkes was not aware that Peterson had filed any equal employment opportunity complaints against the MPD or the City until after this case was filed. (DPFOF ¶ 81.)

Peterson's duties and responsibility as a liaison for the DA's Office include providing testimony at preliminary hearings at the request of the DA's Office. (PPFOF ¶ 87.)

*Polygraph*

On April 15, 2014, Peterson wrote Gibbs about his polygraph certification. (PPFOF ¶ 80.) Peterson filed an EEOC complaint on November 26, 2014 alleging discrimination by the MPD. (PPFOF ¶ 81.) At the time of his transfer, he was the senior polygraphist. (*Id.*) He was replaced by a Caucasian. (*Id.*) The MPD has three active polygraphists, all of whom are Caucasian and have been polygraphists for less time than Peterson. (*Id.*) Gibbs avers that Peterson was trained on an older system, and around June 2014, MPD management decided to phase out the older system. (Declaration of Raymond Gibbs, Docket # 35-1 at ¶¶ 4-5, 12.) The new system required its own training and certification, which was both extensive (10 weeks) and expensive ($10,000.00). (*Id.* at ¶ 7.) On June 2, 2014, there were two detectives certified in the new system, and the MPD posted a vacancy for interested

15

detectives to get certified to fill the third slot. (*Id.* at ¶¶ 9, 11.) Peterson did not apply and was therefore not considered. (*Id.* at ¶ 13.) No more polygraphs are being conducted on the system he was trained on. (*Id.* at ¶¶ 12, 14.) The EEOC issued a Right to Sue letter on December 2, 2014. (PPFOF ¶ 86.)

## ANALYSIS

Construing Peterson's complaint and other pleadings broadly, he makes several arguments. First, he argues that he was discriminated against in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and 42 U.S.C. § 1983 when he was placed on administrative duty while investigations into criminal allegations against him were pending and then not reinstated promptly upon the close of those investigations. Second, he argues that he was retaliated against in violation of Title VII, § 1981, and § 1983 for filing complaints with the EEOC and ERD when he was transferred from the Homicide Unit to being a DA's Office liaison.

### 1. Administrative Duty – Race Discrimination

Peterson's argument that the City violated Title VII, § 1981, and § 1983 as it relates to placing him on administrative duty has two components: Peterson argues that both the decision to place him on administrative duty and the decision to not reinstate him at the conclusion of the dual investigations were motivated by race.

A plaintiff can establish discrimination under all three statutes using either the direct or indirect method of proof. *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 750 n.2 (7th Cir. 2006) (explaining that claims under Title VII and § 1983 "should be analyzed in the same way and . . . the same standard of liability should be imposed."); *Gonzales v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998) ("The same standards governing

16

liability under Title VII apply to section 1981.").[5] The direct method requires that the plaintiff provide direct or circumstantial evidence of the employer's discriminatory animus. *Johnson v. General Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 727 (7th Cir. 2013). The indirect method, by contrast, requires the plaintiff to follow the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Id.* at 728. Under the *McDonnell Douglas* framework, after the plaintiff makes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its action. *Id.* Doing so shifts the burden back to the plaintiff to show that the employer's proffered reason is pretext, which then permits an inference that the employer's real reason was unlawful. *Id.*

## 1.1 Direct Method

Under the direct method, the plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Direct evidence is something close to an explicit admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it "uniquely reveals" the employer's intent to discriminate. *Id.* More common is circumstantial evidence, which "suggests discrimination albeit through a longer chain of inferences." *Id.* (internal citation omitted). A plaintiff can survive summary judgment by producing either type of

---

[5] Whether Peterson can proceed under § 1981 is not clear. As the text of the statute makes clear, § 1981 governs a person's rights in terms of contracts. It is not clear whether Peterson has a contract with the City. Because, however, this claim is decided in the same way as a Title VII claim, I will address it on the merits. So, too, with Peterson's claim under § 1983. Because he is proceeding against the City (and not an individual defendant), any claim brought under § 1983 must be brought under *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 568 (1978). That is, the plaintiff must allege that the wrong committed against him was caused by the local government (the City) acting under an official policy or custom. Peterson does not make arguments about policies or customs, but because a claim under § 1983 (like § 1981) is analyzed under the same framework as a claim under Title VII, I will address it on the merits. That is, all three claims—Title VII, § 1981, and § 1983—will be addressed together.

17

evidence as long as it creates a triable issue on whether discrimination motivated the employment action. *Id.* Our cases point to three categories of circumstantial evidence: (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Id.* A plaintiff need not produce evidence in each category to survive summary judgment. *Id.*

Peterson has not produced any evidence that the decision to place him on administrative duty or the decision to maintain him on administrative duty even after the conclusion on the investigations was motivated by his race. Given the lack of a direct admission, Peterson must provide a "convincing mosaic" of circumstantial evidence that directly points to discriminatory reason for the employer's action. *Davis v. Con–Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004). Peterson seems to make a general argument that the MPD's failure to reinstate him at the close of the DA's Office's investigation shows that his placement on administrative duty was motivated by race-based animus. However, this does not create a triable issue of fact on whether race discrimination motivated the MPD's decision not to immediately reinstate him in the Homicide Investigations Unit at the close of the investigations. Indeed, the City has explained, and Peterson does not dispute, that even though the John Doe and internal investigations were closed, Peterson was *Giglio*-impaired. Therefore, he would not be able to participate in homicide investigations and prosecutions without posing a risk to those investigations and prosecutions based on his diminished credibility. That is, Peterson has not presented

18

evidence that, taken together, points to his race being the motivation behind the department's failure to reinstate him to Homicide immediately.

### 1.2  Indirect Method

Under the indirect method of proof, a plaintiff can "avert summary judgment" by establishing a *prima facie* case of discrimination under the *McDonnell Douglas* formula. *Lewis v. City of Chicago*, 496 F.3d 645, 650 (7th Cir. 2007). Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant "'to produce a legitimate, noninvidious reason for its actions.'" *Hobbs v. City of Chicago*, 573 F.3d 454, 460 (7th Cir. 2009) (quoting *Atanus v. Perry,* 520 F.3d 662, 672 (7th Cir.2008)). If the defendant rebuts the *prima facie* case, the burden then shifts back to the plaintiff to show that the reasons proffered by the defendant are merely pretextual. *Id.*

Even assuming that Peterson could establish a *prima facie* case, the City has provided a legitimate, non-discriminatory reason for failing to remove Peterson from administrative duty immediately upon the close of the investigations. Namely, the DA's Office had invoked *Giglio* against Peterson, meaning that the prosecution would have to disclose credibility-undermining materials to the defense in any case where he would serve as a witness. This meant that in any case where Peterson worked as a detective and/or served as a witness, his ability to provide credible testimony would be undermined. In turn, homicide prosecutions could, and likely would, be compromised. Furthermore, Peterson cannot show that this reason was pretextual. The defendants have stated, and Peterson admits, that management worked to have the DA's Office's *Giglio* decision reversed; they were worried not only about Peterson but also about the precedent it would set for other officers who were the subject of investigations that were found to be unsubstantiated. What is more, once

19

the DA's Office reversed its decision to invoke *Giglio* against Peterson, he was immediately removed from administrative duty and returned to the Homicide Investigations Unit per his request. This further evidences that the department had a legitimate reason to maintain Peterson on administrative duty; as soon as the MPD was able, it reinstated him to his job as a homicide detective.

Because the City has provided a legitimate, non-discriminatory reason for maintaining Peterson on administrative duty past the close of the investigations and Peterson cannot show it was pretextual, his claims based on a failure to reinstate cannot survive summary judgment and are dismissed.

### 2. Retaliation – Transfer from Homicide

Peterson's second claim also arises under Title VII, § 1981, and § 1983. Peterson argues that when he was transferred from his position as a homicide detective to a position working as a liaison for the DA's Office, it was done in retaliation for filing claims with the ERD and the EEOC. Peterson's retaliation claims are analyzed under the same framework, whether brought under Title VII or § 1981, *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007); thus, I will analyze his retaliation claims together.[6]

To overcome the defendants' motion for summary judgment, Peterson may proceed under either the direct or indirect methods. *See id.* I will discuss each in turn. However, I will begin with the City's argument that Peterson did not exhaust his retaliation claim as required by Title VII. Generally, "a Title VII plaintiff cannot bring claims in a lawsuit that were not included in [his] EEOC charge." *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d

---

[6] The Sixth Circuit has found that Title VII may preempt a claim for retaliation. *Day. Wayne County Bd. of Auditors*, 749 F.2d 1199, 1205 (6th Cir. 1984). However, I will analyze the retaliation claim as I did the discrimination claim—together with the other two claims.

497, 500 (7th Cir. 1994) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)). Though the rule is not jurisidictional, it is nonetheless a condition precedent with which a plaintiff bringing a Title VII claim must comply. *Id.* (citing *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir. 1985)). Peterson's July 2011 ERD and EEOC charges alleged race-based discrimination in the department's decision to maintain him on administrative duty after the internal and John Doe investigations were closed. (*See* Exh. 1008, Docket # 27-1.) His second EEOC filing, filed in January 2014, alleged that he was discriminated against because of his race and retaliated against for filing with the ERD and EEOC when he was transferred from the homicide department (and was no longer a polygraphist). (Docket # 30-1 at 138.) He did not receive his Right to Sue letter from the EEOC until December 2, 2014, approximately three months after he filed the present lawsuit. (*Id.* at 139.) Therefore, Peterson did not exhaust his retaliation claim prior to filing this lawsuit. This in and of itself is grounds for summary judgment on Peterson's retaliation claim. However, even on the merits, Peterson cannot defeat summary judgment.

2.1    Direct Method

Under the direct method, Peterson must present direct evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Humphries*, 474 F.3d at 404. The City does not dispute that Peterson engaged in a statutorily protected activity when he filed complaints with the ERD and the EEOC in July 2011. (Br. in Support of Mtn. for Summary Judgment, Docket # 23 at 6.) I will therefore begin with the question of whether Peterson's transfer to working as a liaison for the DA's Office was a materially adverse action.

For an employment action to be adverse, "the challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012) (internal quotation and citations omitted). In *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), the Supreme Court stated that "[w]e speak of *material* adversity because we believe it is important to separate significant from trivial harms." (emphasis in original). The Court noted that Title VII is not a "general civility code for the American workplace" and that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." (*Id.*) Rather, the antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms and it does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Id.* (internal quotation and citation omitted). Normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. *Id.* The Court further stated that "[w]e refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective" because "[i]t avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68-69.

As noted above, Peterson argues that his transfer from homicide to working as a liaison for the DA's office was the adverse action taken against him in retaliation for filing complaints with the ERD and EEOC. Lateral transfers constitute a materially adverse employment action if it affects the employee's wages, benefits, responsibilities, or working

conditions. *See Mercer v. Cook Cnty., Ill.*, 527 Fed. Appx. 515, 522 (7th Cir. 2013) ("[A] mere transfer—without more, such as a reduction in pay or significantly diminished responsibilities or working conditions—falls below the level of an adverse employment action necessary to support a claim of discrimination or retaliation.").

The transfer from the homicide unit did not result in Peterson losing his rank; he maintained, and continues to maintain, his rank as detective. (DPFOF ¶ 79.) There is no evidence in the record about Peterson's benefits. As for his wages, he makes a vague allegation in his complaint about salary. Specifically, he noted that in 2013, he was listed in the *Milwaukee Journal Sentinel* as the highest-paid detective, making $148,000.00, which included overtime. (Am. Compl., Docket # 9 at ¶ 446.) He seems to state that he now makes less—closer to $75,000—because he no longer receives roll call. (*Id.*) The allegations about overtime, for the most part, seem to concern his time on administrative duty. Peterson states that among his duties and responsibilities as a liaison for the DA's Office is providing testimony at preliminary hearings (PPFOF ¶ 87) and swearing to criminal complaints (Dec. of Mark A. Peterson, Docket # 32 at ¶ 56). He does not further elaborate on the differences between his duties as a detective and his job as a liaison.

However, even assuming that Peterson did suffer an adverse employment action, he cannot meet the third element: a causal connection between the protected activity and the adverse employment action. The defendant has presented, and Peterson has not disputed, evidence that prior to his transfer, Peterson had made errors that contributed to the dismissal of two prosecutions. A judge in Milwaukee County met with Peterson's supervisor, Inspector Yerkes, and conveyed her concerns not only with the department in general, but with Peterson explicitly (she did not express concern about any other specific

23

member of the MPD). The DA's Office also had concerns; specifically, given Judge Rothstein's perception of Peterson, the ADA expressed concern that Peterson's credibility would be compromised throughout the county. Given the concerns with his credibility, Yerkes determined that it was in Peterson's, the City's, and department's best interests that he no longer participate in homicide investigations and transferred him to the Investigative Management Division where would serve as a liaison to the DA's Office. Thus, the record demonstrates that leading up to his transfer, management at MPD had concerns about Peterson's ability to effectively participate in homicide investigations and prosecutions. Furthermore, and most importantly, there is uncontroverted evidence that Yerkes had no knowledge of the ERD and EEOC complaints. This, too, shows a lack of a causal connection between the protected activity and the adverse employment action. Peterson, therefore, cannot show he was retaliated against under the direct method of proof.

### 2.2    Indirect Method

Under the indirect method, Peterson must show that after opposing the employer's discriminatory practice only he, and not any similarly situated employee who did not complain of discrimination, was subjected to a materially adverse action even though he was performing his job in a satisfactory manner. *Humphries*, 474 F.3d at 404. Thus, the indirect "method of establishing a prima facie case requires proof both of similarly situated employees and of the plaintiff's performing his job satisfactorily." *Id.* (internal quotation and citation omitted).

Here, the record reflects that Peterson's transfer was a result of his diminished credibility. In February 2014, Inspector Yerkes became aware that Peterson had failed to file reports in two homicide cases—*Newman* and *Gill*. Eventually, both cases were dismissed: a

24

mistrial was declared in *Newman* and *Gill* was dismissed, both due in part to evidentiary issues with the State's case. Peterson was counseled about his failure to file these reports. Subsequently, as outlined above, a Milwaukee County judge called Peterson's credibility into question both on the record and in private conversation with Inspector Yerkes. The judge's opinion of Peterson (and seemingly the department), as well as the DA's Office's opinion that Peterson's credibility would quickly be compromised throughout the county, led Yerkes to become concerned about his ability to be effectively involved in any homicide case going forward. She decided to transfer from homicide to a position where his credibility would not pose a significant problem. Therefore, even if Peterson had presented evidence on similarly situated employees,[7] he cannot show that he was performing his job in a satisfactory manner. He cannot meet his burden under the indirect method of proof.

Because Peterson has not presented evidence that would, if believed by the jury, allow the jury to find in his favor, summary judgment is appropriate on his retaliation claim.

### 3. Discrimination – Transfer from Homicide

Construing Peterson's complaint very broadly, it appears that he is also claiming that his transfer from homicide was based on race discrimination. As outlined above, a discrimination claim under Title VII, § 1981, and/or § 1983 allows a plaintiff to proceed under either or both the direct and indirect methods of proof. As with his discrimination claim based on the department maintaining him on administrative duty, Peterson has not presented evidence that would allow a reasonable jury to find in his favor on this claim. He has presented no direct evidence that he was transferred from homicide because of his race,

---

[7] In his complaint, Peterson makes some allegations about similarly situated employees. However, he provides no evidence to support these allegations as is required for summary judgment. Therefore, they are not part of the record for purposes of deciding this motion.

nor has he pointed to a mosaic of circumstantial evidence that directly points to discriminatory intentions. Similarly, even assuming that Peterson could make a *prima facie* case under the indirect method of proof, the City has offered a legitimate reason for transferring him: his diminished credibility. Peterson has not presented evidence that would allow a jury to find that this reason supplied by the City is pretextual. Though Peterson argues that the fact that he was still required to testify in court shows the City's reason was pretextual, this argument is unavailing. As the defendant argues, the burden the State must meet at a preliminary hearing and the burden the State must meet at a trial are very different. In turn, the degree of scrutiny of a witness' testimony is different. Accordingly, I do not find this fact defeats the evidence the City has put forward about its reason for transferring Peterson. Therefore, to the extent that Peterson is claiming that his transfer out of homicide was because of his race, summary judgment is appropriate on his claim.

### 4. Retaliation and Discrimination – Polygraph

Finally, Peterson seems to claim that he was no longer allowed to serve as a polygraphist in retaliation for his filing of complaints with the ERD and EEOC and because of race-based discrimination. Even assuming this claim was administratively exhausted with the EEOC, summary judgment is appropriate. There is uncontroverted evidence that the MPD was phasing out the polygraph system in which Peterson was trained. In June 2014, two detectives were certified in the new system, and the department posted a vacancy for interested detectives to get certified to fill the third slot. Most importantly, there is uncontroverted evidence that Peterson did not apply for this position. "If a plaintiff does not apply for a job vacancy that is posted, he cannot make a *prima facie* case for unlawful discrimination or retaliation . . . unless [he] demonstrates that the employer's discriminatory

26

practices deterred [him] from applying." *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 558 (7th Cir. 2004) (internal citation omitted). Here, Peterson did not apply to become the third polygraphist trained in the new system, and he has not presented any evidence (or argument) that he was deterred from applying. Therefore, he cannot defeat summary judgment on any claim relating to his no longer being a polygraphist.

## CONCLUSION

Peterson has alleged numerous claims of discrimination and retaliation under Title VII, § 1981, and § 1983. Having reviewed the record, construing it in his favor (and liberally construing his pleadings), I find that there are no disputes of material fact and that the evidence would not allow a rational jury to find in Peterson's favor. Therefore, summary judgment is appropriate and the defendant's motion is granted.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendant's Motion for Summary Judgment (Docket # 22) is **GRANTED**.

**IT IS ALSO ORDERED** that this case be and hereby is **DISMISSED**. The Clerk of Court is directed to enter judgment in favor of the defendant.


Dated at Milwaukee, Wisconsin this 23rd day of December, 2015.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge

27